UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| MATTHEW WALLACE, Derivatively on Behalf of Nominal Defendant CO-DIAGNOSTICS, INC., <br><br> Plaintiff, <br><br> v. <br><br> DWIGHT H. EGAN, REED L. BENSON, BRENT SATTERFIELD, EUGENE DURENARD, EDWARD L. MURPHY, JAMES NELSON, and RICHARD S. SERBIN, <br><br> Defendants, <br><br> and <br><br> CO-DIAGNOSTICS, INC., <br><br> Nominal Defendant. | Case No. <br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** <br><br> Civil No.   2:20-cv-00836-JNP <br><br> Judge Jill N. Parrish |

Plaintiff Matthew Wallace ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant, Co-Diagnostics, Inc. ("Co-Diagnostics" or the "Company"), against its Board of Directors (the "Board") and certain of its executive officers seeking to remedy defendants' breaches of fiduciary duties and Contribution for Violations of Sections 10(b) and 21D of the Securities Exchange Act of 1934.  Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by Co-Diagnostics with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

**I.     NATURE AND SUMMARY OF THE ACTION**

1. Co-Diagnostics is a medical technology company that develops molecular tools for detection of infectious diseases, liquid biopsy for cancer screening, and agricultural applications.

2. In response to the COVID-19 pandemic, Co-Diagnostics developed a diagnostic screening test. On February 24, 2020, the Company's COVID-19 test was one of the first of its kind to be granted regulatory approval in Europe. The Company's stock price surged—reaching $17 per share in early March. On April 6, 2020, the Company was the first to receive regulatory approval from the U.S. Food and Drug Administration ("FDA") for Emergency Use Authorization, allowing the tests to be used by certified clinical laboratories in the U.S,

3. In the following weeks, the Individual Defendants touted the Company's COVID-19 test as being "100% accurate" and denied media reports questioning the accuracy of the test.

4. On May 14, 2020, *The Salt Lake Tribune* reported that TestUtah.com, which used tests developed by Co-Diagnostics, "declined to join other major Utah labs in a joint experiment to confirm one another's quality."

5. The same day, Iowa Governor Kim Reynolds issued a statement stating that Iowa's State Hygenic Lab found that COVID-19 tests used by TestIowa, which included tests from Co-Diagnostics, achieved "ratings of 95% accuracy for determining positives and 99.7% accuracy for determining negatives," well below the Company's claims of "100% accuracy."

6. On this news, the Company's share price fell, closing at $22.13 per share on May 14, 2020 after hitting an intraday low of $18.35 per share.

7. These revelations precipitated the filing of a securities class action in this District against Co-Diagnostics and certain of its officers and directors, captioned *Gelt Trading, Ltd. v. Co-Diagnostics, Inc., et al.*, Case No. 2:20-cv-00368-JNP-DBP (the "Securities Class Action").

8. On October 19, 2020, Plaintiff sent a litigation demand to the Board, demanding that the Board "investigate whether any of Co-Diagnostics' officers and directors committed non-exculpable breaches of fiduciary duties or other violations of applicable law." A true and correct copy of this Demand is attached hereto as Exhibit 1.

9. On October 29, 2020, counsel for the Company responded to the Demand, disputing whether the alleged statements were false or misleading. Without stating whether and when the Board considered the Demand, the response stated that "we consider the matter closed" because "we will not conduct an investigation" into the allegations set forth in the Demand. A true and correct copy of the Company's October 29, 2020 response is attached hereto as Exhibit 2.

10. For these reasons and as set forth in greater detail herein, including the Board's refusal to investigate these matters, Plaintiff now files this action against the Individual Defendants who abandoned their fiduciary duties and should now be held accountable for the financial and reputational harm suffered by Co-Diagnostics and its shareholders.

## II. JURISDICTION AND VENUE

11. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question: contribution for violations of Section 10(b) of the Securities Exchange Act of 1934. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

12. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this district by engaging in numerous activities that had an effect in this District.

### III. PARTIES

**Plaintiff**

13. Plaintiff Matthew Wallace first purchased Co-Diagnostics stock in February 2020 and has continuously owned his Co-Diagnostics stock since that date.

**Nominal Defendant**

14. Nominal Defendant Co-Diagnostics is a Utah corporation with its principal executive offices located at 2401 S. Foothill Drive, Suite D, Salt Lake City, Utah 84109. The Company's common stock trades on the NASDAQ exchange under the symbol "CODX."

**Defendants**

15. Defendant Dwight H. Egan ("Egan") has served as Chief Executive Officer ("CEO") and a director of the Company since 2013. He is a defendant in the Securities Class Action.

16. Defendant Reed L. Benson ("Benson") has served as Chief Financial Officer ("CFO") of the Company since November 2014. He was a director from November 2014 to May 2017. He is a defendant in the Securities Class Action.

17. Defendant Brent Satterfield ("Satterfield") has served as Chief Science Officer ("CSO") of the Company since April 2013. He is a defendant in the Securities Class Action.

18. Defendant Eugene Durenard ("Durenard") has served as a director of the Company since June 2019. He is a defendant in the Securities Class Action. He is Chair of the Audit Committee, and is a member of the Corporate Governance and Nominating Committee and the Compensation Committee.

19. Defendant Edward L. Murphy ("Murphy") has served as a director of the Company since June 2019. He is a defendant in the Securities Class Action. He is Chair of the Corporate

Governance and Nominating Committee, and is a member of the Audit and Compensation Committees.

20. Defendant James Nelson ("Nelson") has served as a director of the Company since August 2019. He is a defendant in the Securities Class Action.

21. Defendant Richard S. Serbin ("Serbin") has served as a director of the Company since May 2017. He is a defendant in the Securities Class Action. He is Chair of the Compensation Committee, and is a member of the Audit Committee and the Corporate Governance and Nominating Committee.

22. The defendants named in ¶¶ 15-21 are sometimes referred to hereinafter as the "Individual Defendants."

## IV. DUTIES OF THE INDIVIDUAL DEFENDANTS

### A. Fiduciary Duties

23. By reason of their positions as officers, directors, and/or fiduciaries of Co-Diagnostics and because of their ability to control the business and corporate affairs of Co-Diagnostics, at all relevant times, the Individual Defendants owed Co-Diagnostics and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were required to use their utmost ability to control and manage Co-Diagnostics in a fair, just, honest, and equitable manner. The Individual Defendants were required to act in furtherance of the best interests of Co-Diagnostics and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to Co-Diagnostics and its shareholders a fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

24.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Co-Diagnostics, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial, and directorial positions with Co-Diagnostics, each of the Individual Defendants had knowledge of material non-public information regarding the Company.

25.     To discharge their duties, the officers and directors of Co-Diagnostics were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of Co-Diagnostics were required to, among other things:

(a)     Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

(b)     Exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

(c)     Exercise good faith to ensure that the Company's communications with the public and with shareholders are made with due candor in a timely and complete fashion; and

(d)     When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

**B.     Audit Committee Charter**

26.     In addition to overseeing the Company's accounting and financial reporting, the Audit Committee Charter states that members are responsible for "the processes utilized by management for identifying, evaluating, and mitigating strategic, financial, operational, regulatory, and external risks inherent in the Company's business (the 'Risks')."

27.     Specifically, the Audit Committee shall:

*Compliance with Legal and Regulatory Requirements:*

5. Review with management and the independent auditor any correspondence with financial and accounting related regulators or governmental agencies and any published reports which raise material issues regarding the Company's financial statements or accounting policies.

\* \* \*

*Risks:*

1. Periodically review and evaluate the processes utilized by management to identify and assign relative weights to Risks.

2. Assess the adequacy of management's Risk assessment and mitigation processes.

V. **SUBSTANTIVE ALLEGATIONS**

    A. **Background**

28. Co-Diagnostics is a medical technology company that develops molecular tools for detection of infectious diseases, liquid biopsy for cancer screening, and agricultural applications. Its proprietary molecular diagnostics technology involves a novel approach to polymerase chain reaction ("PCR") test design ("CoPrimers") that eliminates one of the key issues of PCR amplification: the exponential growth of primer-dimer pairs (false positives and false negatives), which adversely interferes with identifying the target DNA. Defendant Satterfield developed the Company's intellectual property using predictive mathematical algorithms and proprietary reagents used in the testing process.

29. At the end of 2019, Co-Diagnostics was at risk of being delisted from the NASDAQ exchange because its stock was trading below $1.00 per share, the minimum bid price to remain listed on the exchange. On December 31, 2019, the Company's stock closed at $0.8952 per share.

30. Then, in response to the COVID-19 pandemic, Co-Diagnostics developed a diagnostic screening test. On January 23, 2020, Co-Diagnostics announced that it completed the

principle design work for the COVID-19 test, which uses the patented CoPrimer technology and the Company's proprietary software system.

31.     On February 24, 2020, the Company's COVID-19 test was one of the first of its kind to be granted regulatory approval in Europe.  The Company's stock price surged—reaching $17 per share in early March.

> **B.     The Individual Defendants Cause the Company to Issue Misleading Statements**

32.     In the following weeks, the Individual Defendants touted the Company's COVID-19 test as being "100% accurate."

33.     On March 20, 2020, the Individual Defendants caused the Company to announce that it would begin fulfilling orders from a wider array of U.S. customers. In the press release, Co-Diagnostics stated:

> A recent FDA policy change aimed at expediting the availability of COVID-19 diagnostics has allowed the Company to expand domestic sales of its test immediately. Co-Diagnostics' COVID-19 polymerase chain reaction (PCR) test can yield results in under two hours, and successfully passed the clinical evaluation as requested in the policy change, ***showing sensitivity of 100% and specificity of 100% in detecting SARS-CoV-2,*** the virus which causes COVID-19, without demonstrating any cross-reactivity with other coronaviruses.

34.     On April 6, 2020, the Company was the first to receive regulatory approval from the U.S. Food and Drug Administration ("FDA") for Emergency Use Authorization, allowing the tests to be used by certified clinical laboratories in the U.S.

35.     On April 30, 2020, *The Salt Lake Tribune* published an article entitled, "'This is a potential public health disaster:' COVID-19 results from TestUtah.com are raising questions." The article raised concerns that Co-Diagnostics' COVID-19 tests, which TestUtah.com used, had a higher rate of false negatives.  Specifically, the article stated, in relevant part:

> As of this week, TestUtah had eight testing sites around the state and had conducted tests on more than 18,000 Utahns, more than half of whom did not have symptoms

> of the coronavirus — despite state guidelines that only symptomatic patients should be tested.
>
> That is likely to produce more negative results than the state's other test sites, said executives of the companies involved with TestUtah. Mark Newman, whose health software company Nomi Health has a $5 million contract with the state to run the group's testing, said comparing TestUtah's results with those of other sites is "not apples to apples."

36. Defendant Satterfield dismissed these as merely "population differences." The article continued to state:

> "*We're talking about population differences," agreed Brent Satterfield*, founder and chief science officer of Co-Diagnostics Inc., which produces the test kit used by TestUtah's sites.
>
> But *according to state data obtained by The Tribune, TestUtah has reported test results for symptomatic patients separately* — and even for those patients, positive results are far below those reported at other test sites in the state.
>
> About 2% of symptomatic patients at TestUtah's sites have tested positive for coronavirus since April 1, according to the state's data. That's less than half of the 5% of patients testing positive at other Utah sites.
>
> \*   \*   \*
>
> But the Co-Diagnostics test has a "higher limit of detection compared to tests offered by more established vendors," Lopansri wrote, referring to the test's sensitivity. A higher limit of detection means more virus is required in a sample to trigger a positive result.
>
> An analysis by the life sciences publication BioCentury showed that at least 16 of 22 comparable tests authorized by the FDA report a lower limit of detection, or greater sensitivity, than Co-Diagnostics' tests.
>
> Its limit of detection also is higher than that of the CDC's test, wrote Dan Diekema, director of the infectious diseases division at the University of Iowa's department of internal medicine.

37. In the same article, defendant Satterfield claimed that the tests were between "99.52% and 100%" accurate and that the 50 other countries, where Co-Diagnostics had sold its test, had not complained. Specifically, the article stated, in relevant part:

> But Satterfield maintained that in a real-world environment, people who have contracted COVID-19 have thousands or even hundreds of thousands of particles

of the virus in their samples, and that's plenty to trigger a positive in his company's tests.

He added that Co-Diagnostics' COVID-19 tests scored between **99.52% and 100% in evaluations conducted by the FDA and in Europe.** He said those evaluations often put his kits side by side against other available kits to gain consensus results.

"We are in the same ballpark as the other tests," Satterfield said.

And there have been no complaints from nearly 50 other countries, where Co-Diagnostics has sold the majority of its tests, Satterfield said.

38. On May 1, 2020, the Individual Defendants caused Co-Diagnostics to issue a press release entitled: "Co-Diagnostics, Inc. Releases COVID-19 Test Performance Data: Consistently Demonstrates 100% Sensitivity and 100% Specificity Across Independent Evaluations." Therein, the Individual Defendants caused the Company to claim that its COVID-19 test was accurate, stating:

> Co-Diagnostics, Inc. (Nasdaq: CODX), a molecular diagnostics company with a unique, patented platform for the development of molecular diagnostic tests, today released **COVID-19 test performance data demonstrating 100% sensitivity and 100% specificity, the metrics used to define accuracy in molecular diagnostics testing.**
>
> The data being released comes from independent evaluations of the performance of the Company's COVID-19 test in the field. These evaluations include the India National Institute of Pathology, the Mexican Department of Epidemiology ("InDRE"), and others in the US and abroad. **Each study concluded 100% concordance for both specificity and sensitivity.**
>
> A summary of recent validation data and the data itself can be found here.
>
> In remarking on the test's favorable limit of detection (LOD) results in the evaluations, Brent Satterfield, PhD said, "In diagnostics, **the limit of detection or LOD is a single metric** that helps inform the key metrics of sensitivity and specificity **but is not relevant as a stand-alone data point**. Other metrics that are important are availability, ease of use and throughput. In countries where we have been evaluated against other tests, **we have consistently and repeatedly achieved 100% clinical sensitivity and specificity and you can't do better than that**."

39. The above statements in ¶¶ 33, 36-38 were materially misleading because they overstated the accuracy of the Company's COVID-19 tests.

### C. The Truth Begins to Emerge

40. On May 14, 2020, *The Salt Lake Tribune* reported that TestUtah.com, which used tests developed by Co-Diagnostics, "declined to join other major Utah labs in a joint experiment to confirm one another's quality." The article stated, in relevant part:

> Amid questions about the accuracy of TestUtah.com's coronavirus test results, the statewide testing operation declined to join other major Utah labs in a joint experiment to confirm one another's quality.
>
> Instead, the TestUtah companies agreed to a less-sophisticated "compromise" experiment to compare results with the state lab, said state epidemiologist Dr. Angela Dunn. "This is a quick and dirty way to learn whether there is a difference," she said.
>
> But the results of the more rudimentary accuracy check may not be made public.

41. The same day, Iowa Governor Kim Reynolds issued a statement stating that Iowa's State Hygenic Lab found that COVID-19 tests used by TestIowa, which included tests from Co-Diagnostics, achieved "ratings of 95% accuracy for determining positives and 99.7% accuracy for determining negatives."

42. The same day, the FDA underscored: "No test will be 100% accurate due to performance characteristics, specimen handling, or user error . . . ."

43. On this news, the Company's share price fell, closing at $22.13 per share on May 14, 2020 after hitting an intraday low of $18.35 per share.

44. Then, on May 20, 2020, statistician Zhiyuan Sun wrote an article[1] identifying details in the Company's studies and further casting doubt on Co-Diagnostics' claims of a 100% accurate test. For example, he stated that one of the studies had a sample size of only 200 patients and that "[w]ith a sample size that small, a low error rate, say 1% to 2%, could be really hard to

---

[1] Zhiyuan Sun, "Is Co-Diagnostics' Stock in a Bubble?" *Motley Fool*, (May 20, 2020). https://www.fool.com/investing/2020/05/20/is-co-diagnostics-stock-in-a-bubble.aspx

detect." He also pointed out that "the study itself explicitly stated that the test could in fact be 96% to 98% effective, rather than 100%."

45. The same day, an article published on InvestorPlace stated that 23 other COVID-19 tests were more accurate than Co-Diagnostics' test. The article stated:

> But the test's reliability appears to be meaningfully below that of many of Co-Diagnostics' competitors.
>
> Specifically, an evaluation of 26 other coronavirus tests conducted by a non-profit organization called The Foundation for Innovative New Diagnostics, or FIND, found that 18 of the negative tests had a 100% accuracy rate. Moreover, 23 of the 26 tests had a higher accuracy rate on positive results than Co-Diagnostics' 95% rate identified by the University of Iowa.
>
> The 5% false-positive rate of Co-Diagnostics' test seems too high and too differentiated from most of the tests evaluated by FIND to be due to chance or an evaluation error.

## VI. DAMAGES TO THE COMPANY

46. As a direct and proximate result of the Individual Defendants' conduct, Co-Diagnostics has been seriously harmed and will continue to be. Such harm includes, but is not limited to:

    a) Legal fees incurred in connection with the Securities Class Action;

    b) Any funds paid to settle the Securities Class Action; and

    c) Costs incurred from compensation and benefits paid to the defendants who have breached their duties to Co-Diagnostics.

47. In addition, Co-Diagnostics's business, goodwill, and reputation with its business partners, regulators, and shareholders have been gravely impaired. The Company still has not fully admitted the nature of its false statements and the true condition of its business. The credibility and motives of management are now in serious doubt.

48. The actions complained of herein have irreparably damaged Co-Diagnostics's corporate image and goodwill. For at least the foreseeable future, Co-Diagnostics will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Co-Diagnostics's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## VII. DERIVATIVE AND DEMAND ALLEGATIONS

49. Plaintiff brings this action derivatively in the right and for the benefit of Co-Diagnostics to redress injuries suffered, and to be suffered, by Co-Diagnostics as a direct result of breaches of fiduciary duty by the Individual Defendants and Contribution for Violations of Sections 10(b) and 21D of the Exchange Act. Co-Diagnostics is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

50. Plaintiff will adequately and fairly represent the interests of Co-Diagnostics in enforcing and prosecuting its rights.

51. Plaintiff has continuously been a shareholder of Co-Diagnostics at times relevant to the wrongdoing complained of and is a current Co-Diagnostics shareholder.

52. When this action was filed, Co-Diagnostics's Board of Directors consisted of defendants Egan, Durenard, Murphy, Nelson, and Serbin.

53. Plaintiff made a demand on the Board to investigate and remedy the violations of law described herein as required by Utah law. As detailed below, the Board rejected the demand within 10 days of receipt of the Demand, and apparently therefore has not evaluated its merits in good faith based on all information reasonably available to it. And, as alleged below, the Board did not in fact act independently in its review of the Demand. The Board's conduct upon receipt of the Demand and thereafter demonstrates not only that the Board did not fully inform itself during

its consideration of the Demand, but also that the Board never considered the Demand in good faith, and rejected it for reasons unrelated to the merits of the claims and Co-Diagnostics' best interests. Accordingly, the Board's refusal of the Demand is not a protected exercise of business judgment.

54. On October 19, 2020, Plaintiff sent the Demand to the Board. The Demand states that Plaintiff has owned shares of Co-Diagnostics since February 2020. The Demand alleges that, as detailed above, Co-Diagnostics overstated the accuracy of its COVID-19 tests.

55. The Demand asks the Board to "investigate whether any of Co-Diagnostics' officers and directors committed non-exculpable breaches of fiduciary duties or other violations of applicable law." Exhibit 1.

56. On October 29, 2020, counsel for the Company responded to the Demand, disputing whether the alleged statements were false or misleading. Without stating whether and when the Board considered the Demand, the response stated that "we consider the matter closed" because "we will not conduct an investigation" into the allegations set forth in the Demand. Exhibit 2.

57. As such, the Board wrongfully refused the demand, and Plaintiff therefore has standing to sue derivatively.

58. A majority of the directors who received the Demand were not independent and disinterested. Durenard, Murphy, and Serbin served as the members of the Audit Committee at relevant times. As such, they are responsible for the effectiveness of the Company's internal controls, the integrity of its financial statements, and its compliance with laws and regulations. In their capacities as Audit Committee members, Durenard, Murphy, and Serbin reviewed and approved the disclosures regarding the Company's financial statements, and reviewed and evaluated management's Risk assessment and mitigation processes. As alleged herein, Durenard,

Murphy, and Serbin failed to ensure the integrity of the Company's internal controls, allowing the materially misleading statements to be disseminated in Co-Diagnostics' SEC filings and other disclosures as to the accuracy of Co-Diagnostics' COVID-19 test. Thus, Durenard, Murphy, and Serbin would be interested in a demand regarding their own wrongdoing.

59. Thus, the Board's refusal of the Demand in the face of the foregoing conduct is not a valid exercise of business judgment. Accordingly, a majority of the Board were aware or recklessly disregarded that Co-Diagnostics' representations to investors were materially false and misleading and omitted material information necessary to properly evaluate the Company's financial condition, and therefore could not have independently considered the Demand.

## COUNT I

**Against Defendants Egan, Benson, Satterfield, Durenard, Murphy, Nelson, and Serbin for Breach of Fiduciary Duty**

60. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

61. Defendants Egan, Benson, Satterfield, Durenard, Murphy, Nelson, and Serbin each owes and owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Co-Diagnostics' business and affairs, particularly with respect to issues as fundamental as public disclosures.

62. The conduct by defendants Egan, Benson, Satterfield, Durenard, Murphy, Nelson, and Serbin set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company. Defendants Egan, Benson, Satterfield, Durenard, Murphy, Nelson, and Serbin intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Co-Diagnostics.

63. In breach of their fiduciary duties owed to Co-Diagnostics, defendants Egan, Benson, Satterfield, Durenard, Murphy, Nelson, and Serbin willfully participated in and caused the Company to expend unnecessarily its corporate funds, rendering them personally liable to the Company for breaching their fiduciary duties.

64. In particular, defendants Egan, Benson, Satterfield, Durenard, Murphy, Nelson, and Serbin knowingly or recklessly made untrue statements and/or permitted the Company's public filings, disclosures, and statements to misleadingly report revenue and the Company's overall prospects.

65. As a direct and proximate result of the breaches of their fiduciary obligations by defendants Egan, Benson, Satterfield, Durenard, Murphy, Nelson, and Serbin, Co-Diagnostics has sustained and continues to sustain significant damages, including direct monetary damages, exposure to liability from securities litigation and a loss of goodwill in the capital markets. As a result of the misconduct alleged herein, defendants are liable to the Company.

## COUNT II

**(Against Egan, Benson, Satterfield, Durenard, Murphy, Nelson, and Serbin for Contribution For Violations of Sections 10(b) and 21D of the Exchange Act)**

66. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

67. Defendants Egan, Benson, Satterfield, Durenard, Murphy, Nelson, and Serbin are named as defendants in the related Securities Class Action. The conduct of these Defendants, as described herein, has exposed the Company to significant liability under various federal and state securities laws by their disloyal acts.

68. Co-Diagnostics is named as a defendant in related securities class actions that allege and assert claims arising under § 10(b) of the Exchange Act. The Company is alleged to be liable

to private persons, entities and/or classes by virtue of many of the same facts alleged herein. If Co-Diagnostics is found liable for violating the federal securities laws, the Company's liability will arise in whole or in part from the intentional, knowing, or reckless acts or omissions of all or some of the Defendants as alleged herein, who have caused the Company to suffer substantial harm through their disloyal acts. The Company is entitled to contribution and indemnification from these Defendants in connection with all claims that have been, are, or may be asserted against the Company by virtue of their wrongdoing.

69. As officers, directors and otherwise, Defendants Egan, Benson, Satterfield, Durenard, Murphy, Nelson, and Serbin had the power or ability to, and did, control or influence, either directly or indirectly, Co-Diagnostics' general affairs, including the content of its public statements, and had the power or ability to directly or indirectly control or influence the specific corporate statements and conduct that violated § 10(b) of the Exchange Act and SEC Rule 10b-5.

70. Defendants Egan, Benson, Satterfield, Durenard, Murphy, Nelson, and Serbin are liable under § 21D of the Exchange Act, which governs the application of any private right of action for contribution asserted pursuant to the Exchange Act.

71. Defendants Egan, Benson, Satterfield, Durenard, Murphy, Nelson, and Serbin have damaged the Company and are liable to the Company for contribution.

72. No adequate remedy at law exists for Plaintiff by and on behalf of the Company.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff, on behalf of Co-Diagnostics, demands judgment as follows:

A. Declaring that plaintiff may maintain this action on behalf of Co-Diagnostics and that plaintiff is an adequate representative of the Company;

B. Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

C. Declaring that Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Co-Diagnostics;

D. Directing Co-Diagnostics to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Co-Diagnostics and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1. a proposal to strengthen the Company's controls over financial reporting;

2. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

3. a proposal to strengthen Co-Diagnostics's oversight of its disclosure procedures;

4. a provision to control insider transactions; and

5. a provision to permit the stockholders of Co-Diagnostics to nominate at least three candidates for election to the Board;

E. Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a

constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Co-Diagnostics has an effective remedy;

      F.      Awarding to Co-Diagnostics restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

      G.      Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

      H.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), plaintiff demands a trial by jury.

Dated: November 24, 2020              By: /s/ Zachary Weyher

                                      Zachary J. Weyher (10846)
                                      1953 S. 1100 E., #521524
                                      Salt Lake City, Utah
                                      Telephone: (801) 750-5425
                                      E-mail: zachweyher@gmail.com

                                      **GLANCY PRONGAY & MURRAY LLP**
                                      Benjamin I. Sachs-Michaels
                                      712 Fifth Avenue
                                      New York, New York 10019
                                      Telephone: (212) 935-7400
                                      E-mail: bsachsmichaels@glancylaw.com

                                                   -and-

                                      Robert V. Prongay
                                      Pavithra Rajesh
                                      1925 Century Park East, Suite 2100
                                      Los Angeles, California 90067
                                      Telephone: (310) 201-9150
                                      E-mail: rprongay@glancylaw.com

                                      *Counsel for Plaintiff Matthew Wallace*